## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Robert Pitter, Nicholas L. DeMarco,  Howard Glaser, Afamefuna Agbodike,  and Kurt Jones, individually and on behalf of all others similarly situated, | Case No. 2:12-CV-07106 |
|                 Indirect Purchaser Plaintiffs, | CONSOLIDATED CLASS ACTION COMPLAINT  (INDIRECT PURCHASERS) |
| v. | |
| CertainTeed Corp., USG Corporation, United States Gypsum Company, New NGC, Inc., LaFarge North America Inc., Georgia-Pacific LLC, American Gypsum Company LLC, TIN Inc. d/b/a Temple-Inland Inc., PABCO Building Products, LLC, | |
|                 Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Robert Pitter,, Nicholas L. DeMarco, Howard Glaser, Afamefuna Agbodike and Kurt Jones, by and through their attorneys, bring this Consolidated Class Action Complaint ("Complaint") for indirect purchasers of gypsum board drywall against Defendants CertainTeed Corp., USG Corporation, United States Gypsum Company, New NGC, Inc., LaFarge North America Inc., Georgia-Pacific LLC, American Gypsum Company LLC, TIN Inc. d/b/a Temple-Inland Inc., PABCO Building Products, LLC (collectively "Defendants"). These Defendants, who manufacture, sell, and distribute gypsum board drywall in the United States and who together control the market for drywall, conspired to and did illegally raise, fix, maintain and

stabilize the price of drywall in contravention of federal and state law beginning in the fall of 2011. Plaintiffs seek redress for themselves and those similarly situated.

## NATURE OF THE ACTION

1.      This putative class action alleges that Defendants agreed, combined, and/or conspired among themselves to raise, inflate, fix, maintain, and/or stabilize the price of gypsum board from at least September 2011 to the present.   Because Defendants are horizontal competitors, their conspiracy is a *per se* violation of Section 1 of the Sherman Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and violates the applicable state laws referenced herein.

2.      Gypsum board is the basic material used to form walls and ceilings in over ninety percent of all new residential and commercial structures.   Gypsum board has no competitively significant substitutes due to its unique properties, including being easily and safely installed, resisting fire, dampening sound, and controlling moisture.   It is a commodity, meaning that consumers easily substitute gypsum board manufactured by one defendant for that manufactured by another.   The gypsum board market bears many indicia of a market amenable to collusion, as it features (1) high barriers to entry; (2) price inelasticity; (3) a high degree of concentration; and (4) easy opportunities to conspire.

3.      Starting as least as early as September 2011 and continuing through to the present day, Defendants agreed and conspired amongst themselves to raise, inflate, fix, stabilize and/or maintain the prices at which they sold gypsum board in the United States, beginning with large and coordinated price increases becoming effective on or about January 1 or 2, 2012. Defendants announced these coordinated increases during late September through mid-October 2011.

2

4.     Contemporaneously with their price increase announcements, each of the Defendants abolished the long-standing competitive pricing practice of using "job quotes" to establish prices for projects which included the cost of gypsum board. For decades beforehand, using job quotes had been standard industry practice in the gypsum board industry.   Job quotes specified a price for gypsum board that would be maintained for the life of a construction project, a period which could extend for months or even years. The simultaneous and sudden elimination of the job quote practice facilitated Defendants' ability to monitor each other and insure collective compliance with their price-fixing scheme, ushering in a period of rising prices for gypsum board and ensuring that customers could not avoid the immediate impact of those rising prices.

5.     Coordination amongst the Defendants was necessary in order to implement this dramatic change in prices and the prevailing industry practice of providing job quotes. Without knowing that the other major manufacturers of Gypsum would also raise prices dramatically while eliminating job quotes, any single Defendants doing so would have attracted an overwhelmingly negative reaction from consumers, resulting in the loss of market share and hence profits to its competitors. This fear would have been particularly applicable to American Gypsum, the first Defendant to send any of the price increase announcement letters.   It is implausible to believe that American Gypsum, a relatively small player in the gypsum board market, would have taken the risk of increasing prices and eliminating job quotes without assurance that its competitors would follow suit.

6.     Defendants implemented the 2012 price increases despite little prospect for substantial increases in construction activity and despite substantial overcapacity for producing gypsum board.   This combination of factors makes it highly implausible that any Defendant

3

would act independently in hiking prices substantially and eliminating job quotes. Moreover, Defendants successfully maintained the higher-price regime throughout 2012, which is particularly revealing given the traditional experience in the industry, where prices historically changed in shorter intervals than annually.

7.      Numerous meetings in the gypsum board and building supply industries provided easy and convenient opportunities for Defendants to collude to hatch and then maintain their anticompetitive scheme.  For example, Defendants participated in multiple trade association meetings, including meetings of the Gypsum Association and the Association of the Wall and Ceiling Industry (AWCI) Industry Executives' Conference.  Notably, the Defendants attended an AWCI Industry Executive Conference meeting in Coeur d'Alene, Idaho from September 13-16[th], 2011, where topics were discussed such as how "effective control systems are critical to maintaining margins," how "changes in quoting policies are affecting the way contractors bid and estimate jobs, and the way suppliers and distributors stock inventory," as well as "the reason for the changes to quoting policies."  Just days after this meeting, Defendants announced their price increases and ceased the job quotes policy.

8.      In the fall of 2012, Defendants again announced price increases within a short time of each other, each of which was to take effect on January 1st, 2013.  Again, these price increases were for markedly similar amounts.  Again, these price increases defied what would be expected of independent action based on historical experience in the industry, for they remained in effect for the entire calendar year.

9.      In the fall of 2011, and then again in the fall of 2012, Defendants restricted the supply of gypsum board that customers were allowed to purchase.  Defendants did so to facilitate their collective ability to hike prices and stick to those higher prices.  Absent the supply

4

restriction, large customers would have stockpiled supplies of cheaper gypsum board in the interim between when price increases were announced and when the price increases were to take effect. It is revealing that the Defendants restricted supply even though the industry featured a massive amount of unused capacity, in the vicinity of fifty percent. No Defendant would restrict its supply of gypsum board to customers without assurances that its competitors would do the same, as customers otherwise would have simply turned to competing suppliers to meet their needs, leaving the Defendant who tried to restrict supply with reduced sales and profits.

10.     As a result of Defendants' collusion, Plaintiffs and Class Members paid artificially higher prices for gypsum board than they would have paid in a competitive market.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain equitable and injunctive relief for violations of Section 1 of the Sherman Act (15 U.S.C. § 1). The court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims that arise under federal law and under 28 U.S.C. § 1337 for federal antitrust claims in particular. Plaintiffs also assert claims for damages, to seek restitution, and secure other relief, under state antitrust, unfair competition, consumer protection and unjust enrichment laws.

12.     The Court additionally has subject matter jurisdiction over these state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

13.     This court further has subject matter jurisdiction over the state law claims by virtue of the Class Action Fairness Act of 2005 ("CAFA"), which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, "any member of a class of Plaintiffs are citizens of states different from any Defendant and the aggregated

amount in controversy exceeds $5,000,000, exclusive of interest and costs." The $5 million amount-in-controversy and diverse-citizenship requirements of CAFA are satisfied in this case.

14. Under 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d), this district has venue over the action, for Defendants resided, transacted business, were found, and/or had agents in this District, and this District was the situs of a substantial portion of the affected interstate trade and commerce discussed herein during the Class Period.

15. Each Defendant is subject to personal jurisdiction before this Court because, among other reasons, each of them (a) transacted business, (b) sold and/or distributed gypsum board, (c) maintained substantial contacts, and/or (d) engaged in an illegal and anticompetitive concerted action with respect to gypsum board throughout the United States and in this District. The jointly agreed upon scheme had the intended effect of injuring persons residing in, located in, or doing business throughout the United States, including in the Eastern District of Pennsylvania. By artificially producing supracompetitive prices, the scheme restrained trade unreasonably and negatively affected the market for gypsum board, harming persons throughout the United States and this District who purchased gypsum board for personal use and not for resale, including Plaintiffs and members of the Classes.

## INTERSTATE TRADE AND COMMERCE

16. Defendants' activities, as described herein, were within the flow of and had a substantial effect on, the interstate commerce of the United States, including in this District, as Defendants intended.

17. Defendants manufactured, distributed, and sold gypsum board in an uninterrupted and continuous flow of interstate commerce among the United States and its territories.

Defendants' anticompetitive scheme consequently inflicted a direct, substantial, and reasonably foreseeable effect on interstate commerce.

18.     Plaintiff Nicholas L. DeMarco is a resident of Albany, New York. On or about October 6, 2012, in Albany, New York, Mr. Demarco indirectly purchased gypsum board manufactured by a Defendant. He did not resell the gypsum board but used it for his own purposes. As a result of the misconduct alleged herein, Mr. DeMarco has suffered injury in that he paid more for that product than he would have paid in the absence of the Defendants' misconduct.

19.     Plaintiff Howard Glaser is a resident of Chestnut Hill, Massachusetts. In the fall of 2012, Mr. Glaser purchased from a retail location in Somerville, Massachusetts gypsum board manufactured by a Defendant. He did not resell the gypsum board but used it for his own purposes. As a result of the misconduct alleged herein, Mr. Glaser has suffered injury in that he paid more for the gypsum board product than he would have in the absence of Defendants' misconduct.

20.     Plaintiff Afamefuna Agbodike is a resident of the State of California. On or about November 2012, he indirectly purchased gypsum board manufactured by a Defendant. He did not resell the gypsum board but used it for his own purposes. As a result of the misconduct alleged herein, Mr. Agbodike has suffered injury in that he paid more for the gypsum board product than he would have in the absence of Defendants' misconduct.

21.     Plaintiff Kurt Jones is a resident of Sonoma, California. On or about July 24, 2012, Mr. Jones indirectly purchased gypsum board manufactured by a Defendant at a retail location in Santa Rosa, California. He did not resell the gypsum board but used it for his own purposes. As a result of the misconduct alleged herein, Mr. Jones has suffered injury in that he

7

paid more for the gypsum board product than he would have in the absence of Defendants' misconduct.

22.    Defendant USG Corporation is a public corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. Through its wholly-owned subsidiaries, United States Gypsum Company and L&W Supply Corporation, USG Corporation is a leading manufacturer and distributor of gypsum board. USG Corporation and its subsidiaries are referred to collectively as "USG."

23.    A wholly-owned subsidiary of USG Corporation, Defendant United States Gypsum Company, is organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. USG manufactured and sold gypsum board to buyers in the United States during the Class Period. In 2011 approximately 25% of American gypsum board sales were made by USG.

24.    Defendant New NGC, Inc. ("National Gypsum"), is a wholly-owned subsidiary of Delcor, Inc., which is referred to as National Gypsum Company, and is a privately-held corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Charlotte, North Carolina. National Gypsum manufactured and distributed gypsum board to buyers in the United States during the Class Period. In 2011, approximately 23% of American gypsum board sales were made by National Gypsum.

25.    Defendant LaFarge North America Inc. ("LaFarge"), is a wholly-owned subsidiary of LaFarge SA., and is a corporation organized, existing, and doing business under the laws of the State of Maryland, with its headquarters in Reston, Virginia. LaFarge manufactured and distributed gypsum board to buyers in the United States during the Class Period. In 2011, approximately 8% of American gypsum board sales were made by LaFarge..

8

26. Defendant CertainTeed Corporation ("CertainTeed"), is a wholly-owned subsidiary of Saint-Gobain Corp., and is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Valley Forge, Pennsylvania. CertainTeed manufactured and distributed gypsum board to buyers in the United States during the Class Period. In 2011, approximately 13% of American gypsum board sales were made by CertainTeed.

27. Defendant Georgia-Pacific LLC ("Georgia-Pacific"), is a wholly-owned subsidiary of Koch Industries, Inc., and is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Atlanta, Georgia. Georgia-Pacific manufactured and distributed gypsum board to buyers in the United States during the Class Period. In 2011, approximately 10% of American gypsum board sales were made by Georgia-Pacific.

28. Defendant American Gypsum Company LLC ("American Gypsum") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Dallas, Texas. American Gypsum manufactured and distributed gypsum board to buyers in the United States during the Class Period. In 2011, approximately 10% of American gypsum board sales were made by American Gypsum.

29. Defendant TIN Inc., d/b/a Temple-Inland Inc. ("Temple-Inland"), a wholly-owned subsidiary of International Paper Co., is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Memphis, Tennessee. Temple-Inland manufactured and distributed gypsum board to buyers in the United States during the Class Period. In 2011, approximately 7% of American gypsum board sales were made by Temple-Inland.

9

30.     Defendant PABCO Building Products, LLC is a corporation organized, existing, and doing business under the laws of the State of California, with its headquarters in Rancho Cordova, California and is referred to collectively with its subsidiary PABCO Gypsum Company as "PABCO."  PABCO manufactured and distributed gypsum board to buyers in the United States during the Class Period.  In 2011, 4% of American gypsum board sales were made by PABCO.

## CO-CONSPIRATORS AND AGENTS

31.     The acts taken by Defendants, as alleged herein, were authorized, ordered and condoned by their respective parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

32.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiffs.

33.     Various other persons, corporations, or firms not named as Defendants herein have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

## FACTUAL ALLEGATIONS

### A.     Gypsum Board

34.     Gypsum is a very soft sulfate mineral composed of calcium sulfate dihydrate, with the chemical formula $CaSO_4 \cdot 2H_2O$, commonly extracted from mines in the United States and elsewhere.  To produce wallboard, gypsum must be partially dehydrated or calcined.  This

10

involves crushing the raw gypsum into a powder, drying it, and heating it to remove chemically bound water.

35.     Manufacturers create gypsum board by sandwiching a core of wet gypsum between two sheets of heavy paper or fiberglass mats.  When the core sets and is dried in a large drying chamber, the sandwich becomes rigid and strong enough for use as a building material.

**B.     Gypsum Board's Use in Construction**

36.     Production of gypsum board consumes around 90% of gypsum mined in the United States.  Generally, contractors install wooden pieces of frame, and then workers attach gypsum board to this frame by either screws or nails before seaming individual sheets of gypsum board together using a special drywall compound, leaving an even and flat surface.

37.     Roughly 50% of construction gypsum board goes to new residential construction. Further, over 90% of the new homes constructed in the United States use gypsum board.  A typical American home, newly constructed, contains over 6,144 square feet and 7.31 metric tons of gypsum board, meaning that gypsum board accounts for 3-5% of the cost of the typical new home.

**C.     Gypsum Board is a Commodity**

38.     Defendants' gypsum board products are functionally interchangeable.  Gypsum board made by one manufacturer does not differ significantly from that made by another, and builders and consumers can easily substitute one manufacturers' gypsum board for another's. According to the Gypsum Association, gypsum board is "a family of sheet products consisting of a noncombustible core primarily of gypsum with a paper surfacing or facing."

11

39.     Manufacturers sell gypsum board in standardized dimensions: width, length and thickness.  The most commonly found thicknesses are 1/2 inch, 5/8 inch and 5/16 inch while the most commonly produced height and length is 12 feet by 4 feet.

40.     In markets consisting of standardized and interchangeable products, price is the primary driver of competition.  Gypsum board is such a market: indeed, one Defendant has characterized gypsum board as a "commodity," where the primary difference between sheets of gypsum board made by different manufacturers is the price at which each manufacturer sells its gypsum board.[1]

**D.      Gypsum Board is Unique, Making It Distinct from Other Wall and Ceiling Materials**

41.     Because Gypsum board offers a variety of unique benefits unavailable in other products, the vast majority of all new residential and commercial construction projects in the United States use gypsum board.  As explained in the article *Living with Gypsum:  From Raw Material to Finished Products,* published by the EuroGypsum organization:

> Gypsum is virtually indispensable for the interiors of homes and offices, and indeed all types of building where people congregate such as schools, shops, airports, etc. Its superior performance in providing everyday comfort, in fire resistance, thermal and sound in insulation, heralds an ever greater role for it in buildings of the future. In fact, the safety and protection of people and property against fire, and the effective thermal and acoustic insulation of buildings depends, more often than not, on the unique properties of Gypsum. And many of the attractive features of modern interiors would be impossible without the versatility of Gypsum as a building material.

42.     Workers can install gypsum board much more easily than other products.[2] Indeed, two experienced workers can install gypsum board in an entire house in one or two days

---

[1] *See, e.g.,* Defendant Temple Inland's Form 10Q SEC Filing, 3rd Quarter 2011 at p. 21.
[2] *See Using Gypsum Board for Walls and Ceilings Section* § 1 Gypsum Association (2013) (ease of installation is an outstanding advantage of using gypsum board for walls and ceilings).

whereas it would take them a week or so to cover the equivalent surfaces with plaster. Further, gypsum board is easy enough to use that many amateur home carpenters install it themselves.

43.     In North America, gypsum board is by far the most commonly used interior finish where fire resistance classifications are required. Its noncombustible core contains nearly 21% chemically combined water, which, under high heat, is slowly released as steam. Because steam will not exceed 212 degrees Fahrenheit under normal atmospheric pressure, it retards the transfer of heat and the spread of fire very effectively. Even after complete calcination of the gypsum board, when all the water has been released from its core, gypsum board continues to serve as a heat-insulating barrier. Indeed, tests conducted in accordance with a standard known as ASTM E 84 show that gypsum board has a low flame-spread index and a low smoke-density index.[3]

44.     In addition, gypsum board has much better sound and moisture controlling properties than other materials.[4]

45.     Moreover, safety concerns – particularly with respect to Chinese gypsum board – and transportation costs prevent imported gypsum boards from constituting an adequate substitute for domestically produced gypsum board in most applications.

46.     Accordingly, there are no adequate substitutes for gypsum board, and thus gypsum board in the United States constitutes a distinct market.

E.     **The Gypsum Industry**

47.     Collectively, Defendants' gypsum board sales exceed $5 billion dollars annually. Most of the Defendants are vertically integrated; in other words, they participate in successive steps in the production process, starting with mining and fabricating other principle components

---

[3] *See, e.g., id.*
[4] *Id.*

13

such as paper, and then using these inputs to fabricate gypsum board as it is sold to customers. As the U.S. Geological Report, *Gypsum* 2010 states on page 1:

> The U.S. gypsum industry consisted primarily of a few large, vertically integrated companies that mined gypsum and manufactured wallboard, plaster, and other gypsum products. Companies with the most mines were USG Corp. (USG) with eight mines; Georgia Pacific LLC (GP) with seven mines; National Gypsum Co. (NGC) with six mines; CertainTeed Corp. with six mines; American Gypsum with three mines; Temple Inland Inc. (TI) with two mines; and PABCO Gypsum with one mine. For 2010, these seven companies produced 74% of the total U.S. crude gypsum.

**F.      The Gypsum Board Market Is Amenable To Collusion**

48.     The gypsum board market displays structural features rendering it amenable to a price-fixing agreement or conspiracy, making collusion particularly feasible and attractive. Specifically, the gypsum board market (1) is highly concentrated, (2) features inelastic prices, (3) features high barriers to entry, and (4) offers numerous opportunities for collusion.

**1.      The Gypsum Board Market in the United States is Amenable to Collusion Because It Is Highly Concentrated.**

49.     The smaller the number of firms that dominate a market, the more highly concentrated it is. The gypsum board market in the United States is very highly concentrated by any measure. Taken together, Defendants make more than 99% of American gypsum board sales, with the three largest Defendants clocking in at over 60% of those sales:

| *Manufacturer* | *Market Share 2011* |
|---|---|
| USG | 25% |
| National Gypsum | 23% |
| Saint Gobain/BPB/CertainTeed | 13% |
| Georgia-Pacific | 10% |

14

| American Gypsum | 10% |
| --- | --- |
| LaFarge | 8% |
| Temple-Inland | 7% |
| PABCO | 4% |

50.    This level of concentration has grown higher over the last two decades.  In the 1990s, the market included several smaller regional manufacturers, with only one or two plants each.  As far back as 1997, there were 13 companies in the United States manufacturing gypsum board at 78 plants.   Defendants' SEC filings mentioned "smaller, regional competitors" in the United States before 2002.  After 2002, however, as the industry consolidated, the references to smaller, regional competitors ceased, with the number of market participants steadily declining until, by 2010, just eight companies in the United States manufactured gypsum board at 62 plants.

51.    Basic  industrial  organization  economics  teaches  that  higher  levels  of concentration foster the formation and operation of cartels by reducing the number of firms needed to agree to fix prices and which must be monitored to maintain a cartel.

52.    The concentration measure frequently used in evaluating concentration for such purposes by industrial organization economists is called $CR_4$:  the share of product sales accounted for by the four largest firms in a given industry.  A seminal study of Department of Justice price-fixing investigations found that 76 percent of cartels occurred in sectors with a $CR_4$ score of 50% or higher, which was about double the average $CR_4$ for manufacturing as a whole. As demonstrated above, the $CR_4$ for the gypsum board market as of 2011 was **71%**, a level of market concentration highly conducive to cartelization.

15

## 2. The Gypsum Board Market in the United States is Amenable to Collusion Because Prices for Gypsum Board are Inelastic.

53.     "Elasticity" is the term used to describe the sensitivity of the amount demanded of a product to a change in the price charged for it.  The more sales of a certain product would decline as the price of that product increases, the more elastic are the prices of that product. Conversely, inelastic pricing exists when the amounts sold of a certain product do not decline significantly even when the price of that product increases significantly.

54.     In other words, when customers have few or no practical alternatives to a given product in the form of cheaper products of similar quality and functionality, they will pay higher prices for the product they need with relatively little reduction in the amount of the product they purchase.

55.     For a cartel to profit by raising prices above competitive levels, pricing must be inelastic.  Otherwise, the price increase would result in such a substantial decline in quantities sold – as customers purchased substitute products or declined to buy altogether – as to render the price increase counter-productive from the point of view of cartel members.  Thus, price inelasticity facilitates collusion.

56.     Pricing for gypsum board is highly inelastic, in large part because there are no adequate substitutes for the product.  As established above, nearly all new construction and renovation for commercial or residential building in this country utilize gypsum board because no product with equivalent functionality is available.  Thus, the cartel's substantial increase of gypsum board prices did not lead to a substantial drop in the quantities of gypsum board sold, for there were simply no feasible alternative materials that buyers could use.

16

57.     In short, Defendants took advantage of the high inelasticity of gypsum board prices to raise them to supra-competitive levels in order to generate more revenue and profit than they could have obtained through competition.

### 3.     The Gypsum Board Market in the United States is Amenable to Collusion Because It Features High Barriers to Entry.

58.     Under basic economic principles, cartels that raise prices to supra-competitive levels would, in the ordinary course, attract new entrants in search of the supra-competitive profits that result from supra-competitive prices.  Left unchecked, that process would result in steadily increasing supply exerting downward pressure on prices, ultimately driving them back to competitive levels.  Where high barriers to entry exist, however, new entrants are less likely to enter the market or are dissuaded from entering it altogether.  Thus, barriers to entry facilitate the formation and maintenance of cartels.

59.     Substantial barriers preclude, reduce or make entry into the gypsum board market so difficult in the United States as to prevent the existence of new entrants from providing a competitive discipline to the market.  One such barrier to entry into the gypsum board market is the daunting capital required.  Entry into the gypsum board market would require tens or hundreds of millions of dollars, for capital items such as plants and equipment, in addition to other requirements such as obtaining regulatory approvals, building out the transportation and electrical infrastructure for distribution, and acquiring labor with the requisite skill and experience.  Constructing the plants and acquiring the equipment in particular would be a lengthy process extending over several years because such items must be built to the particular requirements of the operation and its location.  As an example of the cost of merely acquiring one gypsum plant, a plant located in Nashville, Arkansas sold for $97 million in 1997.

60.     Moreover, as alleged above, most gypsum board manufacturers are vertically integrated. Therefore, to compete profitably in the gypsum board market, a new entrant would have to put together the components necessary to operate at the various vertical levels occupied by the incumbents.  Consequently, the new entrant would have to acquire or purchase access to one of a limited number of gypsum mines, develop a distribution network of warehouses and shipping, and build out the sales and customer service staff to market and support its products. Illustrative of the costs involved in putting together all these aspects of the operation, Celotex Corporation sold its gypsum wallboard business in 2000 for $345 million.

61.     These high barriers to entry inspired and enabled Defendants' anti-competitive scheme, reassuring the conspirators that new entrants could not emerge to undercut their supra-competitive prices or offer an alternative to their supply restrictions and prohibition of job quote pricing.

> **4.     The Gypsum Board Market in the United States is Amenable to Collusion Because of the Numerous Opportunities for Defendants to Collude.**

62.     Defendants had numerous opportunities to agree to fix prices and coordinate pricing policies through analyst phone calls and trade association activities.  Every Defendant belongs to a trade association called the Gypsum Association (the "Association"), founded in 1930, with most Defendants having a representative appointed to the Association's Board. During 2011-2012 the following were on the Association's Board of Directors:  Chairman Leo J. Bissonnette (Georgia-Pacific), Past Chairman Stephen Raley (Temple-Inland), First Vice President John K. Donaldson (CertainTeed), Second Vice President Joseph Holmes (USG) and Treasurer Craig Robertson (National Gypsum).  For 2012-2013, the following were on the board of directors:  Chairman Joseph Holmes (USG), Past Chairman Leo J. Bissonnette (Georgia-

18

Pacific), First/Second Vice Chairman Craig Roberson (National Gypsum), and Treasurer Ryan Lucchetti (PABCO).

63.     The Association conducts quarterly meetings and a yearly conference attended by many employees of Defendants, including their CEOs and executives.  The meetings feature not only formal seminars and presentations, but more informal dinners, sporting activities and side trips, where the conspirators could easily and freely discuss their plans.

64.     In addition, each Defendant also belongs to the Association of the Wall and Ceiling Industry ("AWCI").  Most notably, the representatives of the Defendants attended an AWCI Industry Executive Conference meeting in Coeur d'Alene, Idaho from September 13-16[th], 2011, with over 140 attendees.  Defendant USG sponsored the entire event while Defendant National Gypsum sponsored the golf tournament.  On September 15th, a "Supplier and Manufacturers Committee" meeting was conducted.  On September 16th, the Gypsum Board Committee met.  During the overall conference, attendees discussed topics such as how "effective control systems are critical to maintaining margins" and how "changes in quoting policies are affecting the way contractors bid and estimate jobs, and the way suppliers and distributors stock inventory" as well as "the reason for the changes to quoting policies."  Just days after this meeting, Defendants began announcing price increases and their changes in the job quotes policy.

65.     Shortly after these announcements, the Defendants met in mid-October at the Gypsum Association trade meeting in Las Vegas, Nevada, attended by over 280 delegates.  One of the express purposes of the meeting was to "give industry participants the opportunity to meet together . . . [and] bring themselves up-to-date with the latest developments" in the industry.  At that meeting, Dr. Bob Bruce, owner of Innogyps, Inc., and a leading observer of the gypsum industry, acknowledged that the industry faced difficult economic conditions and warned

explicitly that those conditions did not support a price increase. He stated, "The industry needs to achieve in the region of 85% capacity utilization to be able to push through price raises, rather than the 55% level we are at right now."

66.     These industry meetings, among others, provided opportunities to meet and confer regarding the price of gypsum board, elimination of competitive job quotes, restriction of gypsum board supply, and implementation as well as maintenance of the conspiracy described herein.

### 5.     The Gypsum Board Industry's History of Collusive Behavior

67.     The price-fixing conspiracy alleged herein is not Defendants' first experience with violating antitrust and unfair competition laws. For example, the European competition authority in 2002 fined four gypsum companies – including the two companies that sell gypsum board in America, Defendant LaFarge and a predecessor of Defendant CertainTeed -- $455 million dollars for their conspiracy to inflate prices from 1992 through 1998.

39.     As far back as 1948, the United States Supreme Court, in *U.S. Gypsum Co. v. National Gypsum Co.*, 333 U.S. 364 (1948), allowed to proceed a complaint alleging that gypsum board manufacturers, including USG, violated the Sherman Act by colluding to fix prices on not only gypsum board, which was then patented, but also affiliated products, by means of standardizing the production and final output of gypsum board, regulating distribution and instituting a regime of minimum resale prices.

40.     In 1971, gypsum manufacturers including Defendants USG and National Gypsum were found to have engaged in a conspiracy to fix the price of gypsum board. *Wall Products Co. v. National Gypsum Co.*, 326 F. Supp. 295 (N.D. Cal.).

41.     Later in the 1970s, a jury convicted gypsum manufacturers, including defendants USG, National Gypsum, and Georgia-Pacific of committing felonies by engaging in a nationwide cartel inflating gypsum board prices.  Those convictions were reversed on appeal, but the Third Circuit nevertheless found the evidence sufficient to support the conclusion that the Defendants had conspired to violate the antitrust laws.  *United States v. United States Gypsum Co.*, 600 F.2d 414, 419-20 (3d Cir. 1979).

**D.     Defendants' Collusion**

68.     Beginning at least as early as mid-September 2011, Defendants implemented a multi-faceted anticompetitive scheme to raise gypsum board prices to supra-competitive levels and maintain them there, eliminate the prevailing industry practice of providing "job quotes," and restrict the supply of gypsum board.

**1.     In the Fall of 2011, Defendants Announced Price Increases of 35% to Take Effect in 2012.**

69.     Between the AWCI meeting in Coeur d'Alene in September, 2011 and the Gypsum Association trade meeting in Las Vegas, Nevada in October, 2011 five of the eight Defendants manufacturers made across the board announcements to their American customers by means of letter that gypsum board prices would spike in January 2012 by 35% -- a historically unprecedented increase.  They also announced that – unlike traditional price changes -- these price increases would remain in place throughout the following calendar year, in this case 2012:

- On September 20, 2011, Defendant American Gypsum stated, "Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products.  This increased price (up 35%) will be your price for the entire year 2012.  This increase applies to all segments of the business."

- On September 28, 2011, defendant USG stated that "new pricing…will be effective on all wallboard purchases beginning January 1, 2012."

- On September 30, 2011, Defendant National Gypsum stated "National Gypsum Company will implement a price increase of 35% on all wallboard products, to be

21

effective on January 1, 2012. It is our intention that the resultant price (up 35%) will apply for all 2012."

- On October 3, 2011, Defendant CertainTeed stated that customers would receive a new price schedule on November 15 for "all wallboard products." CertainTeed later stated that "our price increase, intended to be in effect for the calendar 2012 year, will range between 35% and 37% for all gypsum wallboard products."

- On October 4, 2011, Defendant LaFarge North America stated "on Monday, January 2nd 2012 we will implement a 35% increase on all our wallboard products."

- On October 12, 2011, Defendant PABCO stated "Effective January 1, 2012, PABCO will implement a 35% price increase across all product lines. This increase will establish pricing for the calendar year 2012."

70.     Similar substantial price hikes, effective for all of 2012, were announced by Defendants USG, Temple-Inland and Georgia-Pacific around this time.

71.     This pricing approach was unusual relative to prior pricing history for a number of reasons. First, the 35% price increase for gypsum board was the largest in more than ten years. Second, all of the Defendants indicated that they would implement this price increase on virtually the same date, either January 1 or January 2, 2012. Previously, Defendants had typically announced their own price changes with disparate effective dates for those changes. Third, the price hikes announced in the fall of 2011 were to be effective for the entirety of calendar year 2012. Previously, many Defendants had changed prices more frequently than on an annual basis. For example, in the first eight months of 2008, there were four announced price changes by gypsum board manufacturers. Fourth, the price hikes announced in the fall of 2011 were in fact implemented when specified and maintained throughout the year, whereas earlier price announcements were frequently modified after announcement. For example, some gypsum manufacturers announced price changes effective in November 2010, then subsequently delayed those increases and rolled them out in two installments: one in March 2011 and one in May 2011.

72.     In December 2011, one distributor summarized the situation as follows:  "As you are probably now aware, all the drywall manufacturers have revised their pricing strategies beginning in 2012. ... The manufacturer letters that have been published vary slightly from manufacturer to manufacturer but it amounts to approximately 35% across the gypsum wallboard category."[5]

73.     The large spike in gypsum board prices in the fall of 2011 was not in response to, or in expectation of, an increase in the quantity of gypsum board expected to be purchased the following year.  Indeed, they warned investors that in 2012 "demand for drywall would be no better this year than last."[6]  National Gypsum stated that the level of wallboard quantities purchased "has essentially been flat and at historically low levels" and projected that the "outlook for the next 12 to 18 months might at best be described as a slow 'climb out.'"[7]  CertainTeed projected in October 2011 that "[t]he housing market is still anemic with little expectation of real improvement in the coming year."[8]  Similarly, in October 2011, USG stated that it believed that the market is "going to be flat next year."[9]

74.     Moreover, before the announcement in the fall of 2011 of Defendants' collusive price spike, gypsum board prices had been falling for three straight months:  down 0.6% in July 2011, 1.7% in August 2011 and 1.7% in September 2011.[10]

42.     In sum, Defendants anticipated the soft market for their products to continue but nevertheless announced virtually simultaneously a large hike in gypsum board prices.

---

[5] National Lumber Online Networking Forum.  *See* http://nationallumber.wordpress.com/2011/12/20/2012-drywall-price-increase-explanation/
[6] *See* http://online.wsj.com/article/BT-CO-20120206-712258.html
[7] *See* http://www.oldfort.com/pdf/NatGyp_093011.pdf
[8] *See* http://www.karpp.com/c/document_library/get_file?uuid=b98d6f22-b77a-41c8-a2af-5a2992954e14&groupId=12804   [The letter bears the ostensible date of October *2012*, but the content of the letter reflects that the ostensible date is a typographical error, and that the letter in fact was written in October *2011*.]
[9] *See* Interview: "USG's CEO Discusses Q3 2011 Results" at p. 15.
[10] *See* http://eyeonhousing.wordpress.com/2011/11/03/sharp-rise-in-gypsum-prices-likely-in-new-year/

Economic facts could neither justify nor uphold the price hike, and thus the only plausible explanation for its existence was Defendants' conspiratorial conduct.

75.     The costs of the major inputs into gypsum board were stable or even falling in 2011 and 2012. Accordingly, there was no increase in production or selling costs that would explain the large 2012 price increase. Moreover, as alleged above, most of the Defendants are vertically integrated. Consequently, they could and did exert control over the major component costs that go into gypsum board, components such as the mineral itself and paper.

76.     Because of the conspiracy alleged herein, Defendants increased prices for gypsum board despite stable input costs and expectations of a soft market without fear that their customers could turn to competitors who were selling at a lower price, precisely because those competitors had agreed **not** to sell at a lower price. Without such conspiratorial conduct, gypsum board prices should have been expected to remain relatively stable in light of costs and market expectations. That prices rose substantially and for all Defendants in 2012, despite competitive conditions dictating stable prices, indicates collusive behavior.

77.     Moreover, Defendants announced and then imposed their price hikes when the industry was experiencing extensive overcapacity. This overcapacity resulted largely from the decline in construction caused by the financial crisis. According to the Census Bureau, construction spending in the United States dropped from a peak of $1,198 billion in 2006 to $ 787.4 billion in 2011, the year when Defendants announced their upcoming price increases and discontinuance of the practice of job quotes. Similarly, gypsum production declined from roughly 15,700,000 metric tons in 2007 to 8,800,000 metric tons in 2011,[11] even though much of the capacity that produced the higher figure was still available four years later.

---

[11] U.S. Geological Survey Report, 2012, a p.70.

24

78.     Indeed, Defendants openly acknowledge the excess capacity in their industry.  In October 2011, US Gypsum stated, "Currently, there is significant excess wallboard production capacity industry wide in the United States.  Industry capacity in the United States was approximately 32.9 billion square feet.  We estimate that the industry capacity utilization rate was approximately 52% during the first nine months of 2010.  We project that the industry capacity utilization will remain at approximately that level for the balance of 2011."[12]  It is well-known in the industry that the existence of overcapacity typically drives prices down.  Historical experience in the industry in non-collusive periods demonstrates that, when capacity utilization drops below 90%, prices fall.[13]

79.     In the absence of collusion, the independent self-interest of each Defendant would have led them to keep prices relatively stable to reap the benefit in terms of increased sales to customers dissatisfied with price increases undertaken by a competing gypsum board company.  Simply put, any one Defendant, or even a small subset of Defendants, could not have maintained sharp price increases given market conditions, for they would have lost revenues when customers responded by purchasing gypsum board from companies that did not sharply increase prices.  Consequently, only collective action enabled Defendants to impose jointly price increases they could not have imposed independently.

### 2.     In the Fall of 2001, Defendants Announced that They Were Eliminating the Practice of Job Quotes.

80.     At the same time that they announced price hikes to take effect in the following calendar year, Defendants also announced that they were eliminating immediately the industry's

---

[12] *See* USG Corp. Form 10Q for 3rd Quarter 2011 at p. 28
http://www.sec.gov/Archives/edgar/data/757011/000095012311093430/c65920e10vq.htm; *See also*
http://seekingalpha.com/article/650501-usg-a-great-bet-on-a-north-america-housing-turnaround ("The utilization rate in the Gypsum industry is around 55%.")
[13] See JP Morgan report (quoting Eagle) at p. 16.

traditional pricing approach of offering job quotes.  Also known as price protection in industry

parlance, job quotes have been a standard feature of the gypsum board industry for decades.

This practice guaranteed customers a set price (or price with a series of specified adjustments)

for gypsum board for a construction project that might take months or years to complete.

Defendants sharply altered the competitive landscape in the industry by abolishing this

traditional pricing practice.

81.    Prior to 2011, job quotes governed the prices for about 70 percent of gypsum

board sold in the United States.  That is one reason why an industry observer described the

elimination of job quotes as "groundbreaking" and "turning the world upside down."[14]

82.    The coordinated elimination of job quotes improved Defendants' ability to

monitor the prices charged by other members of the cartel, and thus enforce the conspiracy.

Previously, the use of job quotes made competitor pricing in the industry difficult to monitor.

Had job quote pricing remained in place, it would have been harder for one cartel member to

determine whether a low price given to a particular customer by another cartel member was

pursuant to a job quote or was instead "cheating" on the cartel price.   Eliminating this

opportunity for subterfuge, Defendants improved their ability to monitor each other and thus

discipline other cartel members in furtherance of their overall price-fixing conspiracy.   By

ending the job quote pricing practice collectively, the Defendants ensured that they could more

easily, accurately and comprehensively observe each other's prices.

83.    A principle and intended effect of Defendants' agreement to eliminate job

quotes was to increase the price of gypsum board.  As one industry research stated:  "The

elimination of job quotes paves the way for a meaningful price increase. . . .  That, in a nutshell

---

[14] http://frameworksmagazine.com/library/wallboard_update2011-10-03.pdf

is the story."[15]   Combining the abolition of job quotes with price hikes maintained throughout

the calendar year allowed Defendants to achieve much higher prices for gypsum board in 2012

than they had charged in preceding years.

84.     As with the price hike announcement letter, Defendants letters in 2011 abolishing

the practice of job quotes bear uncanny similarities indicative of collusion (all emphasis added):

- "Our past job quote policy is no longer appropriate as we seek to improve the consistency and administrative efficiency of our pricing policies.  In light of the changing market, *USG will no longer offer job quotes and/or price protection on wallboard, effective immediately*." (USG letter, September 28, 2011)

- "The practice of providing job quotes is broken and counterproductive to meaningful and consistent price management needed to support profitability. Therefore, *effective immediately, we will discontinue for all product lines the policy of providing job quotes*." (National Gypsum letter, September 30, 2011).

- "In review of our business practices and policies for bringing products to market, we have noted a significant increase in the amount of job quote requests and find the process to be inefficient and administratively burdensome. Accordingly *we find it necessary to cease all job quotes immediately*." (CertainTeed letter, October 3, 2011).

- "*Effective immediately, we will no longer be providing job quotes*." (American Gypsum Letter, September 20, 2011).

- "… *[E]ffective immediately, we will cease all job quotations*." (LaFarge Letter, October 4, 2011).

- "*Effective immediately, PABCO Gypsum will discontinue the policy of providing job quotes*." (PABCO Letter, October 12, 2011).

85.     Each of the remaining Defendants communicated to its customers at or near this

time that it was abolishing job quotes effective immediately.  Unilaterally abolishing job quotes

would have contravened the self-interest of any one Defendant.  Any independent Defendant

singly discontinuing the practice of making job quotes available would have triggered an

---

[15] Brian Johnson, *Not Good Timing: Drywall Prices Rising*, FINANCE & COMMERCE, Feb. 16, 2012 (quoting Kathryn Thompson, Senior Research Analyst for the Thompson Research Group).  *See http://finance-commerce.com/2012/02/%e2%80%98not-good-timing%e2%80%99-drywall-prices-rising/*

extremely hostile customer reaction, leading to plummeting revenues and lost profits as customers flocked to competitors offering job quotes. In short, no one Defendant held the market power to eliminate the practice of providing job quotes by itself; only by colluding could Defendants eliminate the practice to further suppress competition among themselves.

86.     Defendants have reaffirmed their refusal to offer job quotes since the initial announcements in the fall of 2011. National Gypsum on September 6, 2012, stated, that "our elimination of the practice of providing job quotes remains in effect and is strictly enforced." Similarly, CertainTeed stated on September 13, 2012, that it "continues our policy of not providing price quotes to customers for specific projects."   The other Defendants also have maintained the abolition of job quotes since they were announced.

> **3.     In the Fall of 2011, Defendants Also Began Restricting Supplies of Gypsum Board by Limiting the Quantities Customers Could Purchase.**

87.     At the same time as they announced price hikes and the abolition of job quotes, Defendants also restricted the supply of gypsum board that distributors or other customers could purchase. Around September 2011, Defendants USG, National Gypsum, American Gypsum, PABCO, CertainTeed and Georgia-Pacific prohibited purchasers from buying a greater quantity of gypsum board than they had bought in comparable periods earlier in the year. Specifically, Defendant CertainTeed stated in a letter dated October 26, 2012 that "to address the likelihood of increased product demand, prior to the new price, CertainTeed reserve[d] the right to regulate shipments prior to the increase." This policy of restricting supply facilitated Defendants' anticompetitive scheme by further reducing the ability of cartel members to cheat on the cartel by way of making large sales of gypsum board at the lower prices prevalent before the price hikes took effect.

28

88.    To enforce the supply restrictions, Defendants monitored purchasers to prevent the purchasers from increasing inventory in an effort to evade the price hikes. Defendants have also notified each other, as a part of their concerted action, when a particular customer holds out the prospect of building up inventory excessively. They have then notified such customers, typically distributors, that they have begun monitoring of its purchases.

89.    A well-known industry analyst observed, with respect to the announcement in 2012 of price increases to take effect in 2013, that "most distributors were reminded of their limited ability to procure product ahead of last year's price increase, which was driven in large part by controlled distribution and manufacturers rather uniformly taking down their plants for maintenance in mid to late December, which severely limited distributors' ability to procure product at that time." The analyst went on to state that, around mid-September 2012, "manufacturers implemented a national allocation program," limiting distributor's ability to place new orders to reflect their average quantities purchased over the last one or two quarters.

90.    Defendants imposed these supply restrictions in the face of an excessively large amount of unused capacity, as alleged above. Indeed, Defendant USG recognized in 2012 that the manufacturer's capacity utilization was still at a level that should be considered "historically low."

91.    Restricting the supply of gypsum board made available to purchasers contravenes the independent interest of any individual Defendant, especially in light of the overcapacity in the industry. Had an individual manufacturer in a truly competitive market attempted to restrict the amount of purchases by a given buyer, the buyer would have solicited competing manufacturers, who would have been eager to employ their unused capacity to fill such orders. Consequently, a gypsum board manufacturer restricting supply independently would almost

29

certainly lose the specific order and also likely lose the customer permanently by causing the customer to buy from another manufacturer who was not imposing such restrictions. By acting collusively rather than independently, Defendants successfully imposed both sharp price hikes and supply restrictions, each secure in the knowledge that its co-conspirators would not win over disaffected customers.

### 4. In the Fall of 2012, Defendants Announced Price Hikes to Take Effect on January 1, 2013

43.     Defendants again inflicted a sharp price hike on customers out of all proportion to the mild changes in market conditions that were foreseen. This second round of nearly identical price increases, announced in August and September 2012, took effect on the same date (January 1, 2013), and remain in place for the entire calendar year 2013. Specifically:

- Defendant American Gypsum stated on August 22, 2012 that it would impose an additional 25% price increase on all gypsum board products on January 1, 2013, applying throughout 2013.

- Defendant National Gypsum stated on September 6, 2012, that it "will increase prices on its entire Gypsum Wallboard product line… by 30% across the board. It is once again, our intention that this increase will be good for the entire calendar year of 2013. In addition, our elimination of the practice of providing job quotes remains in effect and is strictly enforced."

- Defendant CertainTeed stated on September 13, 2012, that it "will increase price effective with shipments on January 2, 2013 by 30%. This increase amount will apply to all gypsum board products and is intended to be in effect for the entire year." CertainTeed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- Defendant LaFarge stated on October 15, 2012 that effective January 1, 2013, prices of all wallboard products would increase by 30% and "[t]his price increase applies to all our gypsum board products and is intended to be in effect for all of 2013."

- Defendant PABCO stated on October 24, 2012 that "[e]ffective January 1, 2013, PABCO Gypsum will implement a 30% price increase across all product lines. This increase will establish pricing for the Calendar Year 2013."

92.     At or about the same time, USG, Temple-Inland and Georgia-Pacific also informed customers that substantial price increases would be imposed effective January 1, 2013; that those price increases will remain in effect throughout the year; and that their policy of eliminating job quotes remains in place.

93.     Defendants imposed this second round of sharp price hikes even though excess capacity has been a persistent feature of the market since the financial crisis hit.  No single Defendant, acting independently, could hope to stick to such high prices because competitors would employ excess capacity to increase supply, undercutting  such a sharp  price hike.  As USG stated in April 2012:

> [T]here is significant excess wallboard production capacity industry-wide in the United States.  Industry capacity in the United States was approximately 31.9 billion square feet as of January 1, 2012.  We estimate that the industry capacity utilization was approximately 54% during the first quarter of 2012 compared to 51% during the first quarter of 2011 and 56% during the fourth quarter of 2011. We project that the industry capacity utilization rate will remain at approximately the current level for the balance of 2012.

94.     Further, USG acknowledged that "such a low level of capacity utilization" puts "pressure on gypsum wallboard selling prices and gross margins."

95.     Moreover, the Defendants maintained in the fall of 2012 the same sort of supply restrictions they put in place in the fall of 2011 to enable this latest round of exorbitant price hikes.  USG, National Gypsum, American Gypsum, Temple-Inland, LaFarge, CertainTeed and Georgia-Pacific have each informed customers that the volume of their purchases in the fall of 2012 will be restricted.  For example, around September 18, 2012, USG stated that it had "put in a controlled distribution policy for our customers" and, consequently, customers "know there's a ceiling on what they can purchase."

31

## ANTITRUST IMPACT AND INJURY

96.     Defendants' unlawful agreement and conspiracy has had the following effects, among others:

a.   Restraining or eliminating price competition with respect to gypsum board;

b.   Raising, fixing, stabilizing and maintaining prices for gypsum board at artificially inflated levels; and

c.   Depriving indirect purchasers of gypsum board of the benefits of the interplay of free and unrestrained competitive forces..

97.     During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for gypsum board.

98.     The market for gypsum board exists to serve the end-user market, rendering the two markets inextricably linked and intertwined. Without this end-user market, gypsum board has little to no value because it has no independent utility.

99.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for gypsum board than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

/////

/////

/////

## CLASS ALLEGATIONS

100.    Plaintiffs bring this action pursuant to Rules 23(a) (b)(2) and (b)(3) of the Federal

Rules of Civil Procedure on behalf of a class of plaintiffs (the "Nationwide Class" or "Class")

consisting of:

> All person or entities currently residing in the United States who, from January 1, 2012 through the Present (the "Class Period") indirectly purchased gypsum board in the United States manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators.   Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

101.    Plaintiffs also bring this action on their own behalf and as a class action pursuant

to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of

all members of the following classes (collectively, the "Indirect Purchaser State Subclasses" or

"State Subclasses")[16]:

> (a) **Arizona:**  All persons and entities who, from January 1, 2012 through present, as residents of Arizona, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale.   Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Arizona Indirect Purchaser Subclass").

---

[16] The National Class and the State Subclasses shall be referred to collectively as the "Classes."

33

(b) **Arkansas:** All persons and entities who, from January 1, 2012 through present, as residents of Arkansas, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Arkansas Indirect Purchaser Subclass").

(c) **California:** All persons and entities who, from January 1, 2012 through present, as residents of California, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "California Indirect Purchaser Subclass").

(d) **District of Columbia:** All persons and entities who, from January 1, 2012 through present, as residents of the District of Columbia, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "District of Columbia Indirect Purchaser Subclass").

(e) **Florida:** All persons and entities who, from January 1, 2012 through present, as residents of Florida, indirectly purchased gypsum board manufactured by any of the Defendants, their

subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Florida Indirect Purchaser Subclass").

(f) **Illinois:** All persons and entities who, from January 1, 2012 through present, as residents of Illinois, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Illinois Indirect Purchaser Subclass").

(g) **Iowa:** All persons and entities who, from January 1, 2012 through present, as residents of Iowa, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Iowa Indirect Purchaser Subclass").

(h) **Kansas:** All persons and entities who, from January 1, 2012 through present, as residents of Kansas, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the

legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Kansas Indirect Purchaser Subclass").

(i) **Maine:** All persons and entities who, from January 1, 2012 through present, as residents of Maine, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Maine Indirect Purchaser Subclass").

(j) **Massachusetts:** All persons and entities who, from January 1, 2012 through present, as residents of Massachusetts, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Massachusetts Indirect Purchaser Subclass").

(k) **Michigan:** All persons and entities who, from January 1, 2012 through present, as residents of Michigan, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family

36

and judicial staff, and any juror assigned to this action (the "Michigan Indirect Purchaser Subclass").

(l) **Minnesota:** All persons and entities who, from January 1, 2012 through present, as residents of Minnesota, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Minnesota Indirect Purchaser Subclass").

(m)**Mississippi:** All persons and entities who, from January 1, 2012 through present, as residents of Mississippi, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Mississippi Indirect Purchaser Subclass").

(n) **Missouri:** All persons and entities who, from January 1, 2012 through present, as residents of Missouri, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Missouri Indirect Purchaser Subclass").

(o) **Nebraska:** All persons and entities who, from January 1, 2012 through present, as residents of Nebraska, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Nebraska Indirect Purchaser Subclass").

(p) **Nevada:** All persons and entities who, from January 1, 2012 through present, as residents of Nevada, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Nevada Indirect Purchaser Subclass").

(q) **New Hampshire:** All persons and entities who, from January 1, 2012 through present, as residents of New Hampshire, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New Hampshire Indirect Purchaser Subclass").

(r) **New Mexico:** All persons and entities who, from January 1, 2012 through present, as residents of New Mexico, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for

end use and not for resale.  Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New Mexico Indirect Purchaser Subclass").

(s) **New York:**  All persons and entities who, from January 1, 2012 through present, as residents of New York, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale.  Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New York Indirect Purchaser Subclass").

(t) **North Carolina:**  All persons and entities who, from January 1, 2012 through present, as residents of North Carolina, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale.  Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "North Carolina Indirect Purchaser Subclass").

(u) **North Dakota:**  All persons and entities who, from January 1, 2012 through present, as residents of North Dakota, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale.  Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of

any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "North Dakota Indirect Purchaser Subclass").

(v) **Puerto Rico:** All persons and entities who, from January 1, 2012 through present, as residents of Puerto Rico, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Puerto Rico Indirect Purchaser Subclass").

(w)**Rhode Island:** All persons and entities who, from January 1, 2012 through present, as residents of Rhode Island, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Rhode Island Indirect Purchaser Subclass").

(x) **South Dakota:** All persons and entities who, from January 1, 2012 through present, as residents of South Dakota, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her

immediate family and judicial staff, and any juror assigned to this action (the "South Dakota Indirect Purchaser Subclass").

(y) **Tennessee:** All persons and entities who, from January 1, 2012 through present, as residents of Tennessee, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Tennessee Indirect Purchaser Subclass").

(z) **Utah:** All persons and entities who, from January 1, 2012 through present, as residents of Utah, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Utah Indirect Purchaser Subclass").

(aa) **Vermont:** All persons and entities who, from January 1, 2012 through present, as residents of Vermont, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Vermont Indirect Purchaser Subclass").

41

(bb) **West Virginia:** All persons and entities who, from January 1, 2012 through present, as residents of West Virginia, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "West Virginia Indirect Purchaser Subclass").

(cc) **Wisconsin:** All persons and entities who, from January 1, 2012 through present, as residents of Wisconsin, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Wisconsin Indirect Purchaser Subclass").

102.    Subject to additional information obtained through further investigation and discovery, the foregoing Class definitions may be expanded or narrowed by amendment or amended complaint.

103.    **Numerosity:** For each of the Classes, membership is so numerous that joinder of all members is impracticable. On information and belief, each class consists of thousands of individuals and entities who purchased gypsum board manufactured by Defendants during the Class Period, and the membership of the National Class extends into the hundreds of thousands.

104.    **Typicality:**    Plaintiffs' claims are typical of the claims of the members of the Class and State Subclasses because each Plaintiff and all Class and State Subclass members

42

indirectly purchased during the Class Period gypsum board manufactured by one or more of the Defendants and thus each were damaged by the actions of Defendants, which caused them to pay artificially inflated prices for gypsum board.

105.   **Adequacy of Plaintiffs:**   Plaintiffs will fairly and adequately represent and protect the interests of the Class and State Subclass members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class and State Subclass members. Plaintiffs are represented by counsel experienced and respected in the prosecution of class action and antitrust litigation.

106.   **Common Questions:**   This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class and the State Subclasses, such as:

- Whether the Defendants formed and operated an agreement, combination and/or conspiracy to raise, fix, maintain and/or stabilize the prices charged for  gypsum board sold in the United States;
- Whether the Defendants formed and operated an agreement, combination and/or conspiracy to eliminate the practice of providing job quotes;
- The operative time period and extent of these arrangements;
- Whether each Defendant was a participant in any such agreement, combination, or conspiracy;
- Whether the actions of Defendants in so doing violated Section 1 of the Sherman Act and the applicable state laws, discussed below;
- Whether the actions of the Defendants violated the various state laws asserted below;
- Whether the Defendants' conduct had the effect of artificially fixing,  stabilizing, maintaining, and/or inflating the price of gypsum board sold in the United States during the Class Period;
- Whether the conduct of the Defendants caused injury to business or property of Plaintiffs and the members of the Classes;
- The appropriate nature of Class-wide equitable relief; and
- The measure and amount of damages incurred by the State Subclasses.

107.   **Superiority:**   A class action is superior to the other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Classes.  The injury suffered by each individual member of the classes is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' misconduct.  It would be virtually impossible for individual members of the Classes to redress effectively the wrongs done to them.  Even if members of the Classes could afford such individual litigation, the court system could not.  Individual litigation would pose a high likelihood of inconsistent and contradictory judgments.  Further, individualized litigation would increase the delay and expense to all parties, and to the court system, due to the complex legal and factual issues presented by this dispute.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  This action presents no difficulties in management that would preclude its maintenance as a class action.

### CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF SECTION ONE OF THE SHERMAN ACT**
**(On behalf of Plaintiffs and the Nationwide Class for Injunctive Relief)**

108.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint as if set forth in full at this point.

109.   Beginning at least as early as September 2011 and continuing through the present, Defendants have engaged in a continuing agreement or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the prices of gypsum board in the United States.

110. Defendants' conduct featured anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of gypsum board sold in the United States. These activities included:

(a) participation in meetings, conversations, and communications to discuss the price and pricing terms for the sale of gypsum board in the United States;

(b) agreement during those meetings, conversations, and communications to charge prices at specified levels and otherwise to fix, raise, maintain, or stabilize prices of gypsum board sold in the United States;

(c) agreement during those meetings, conversations, and communications to discontinue the industry practice of providing job quotes, in furtherance of their conspiracy to fix, raise, maintain, or stabilize the prices of gypsum board sold in the United States;

(d) agreement during those meetings, conversations, and communications to impose supply restrictions in furtherance of their conspiracy to fix, raise, maintain, or stabilize prices of gypsum board sold in the United States; and

(e) taking numerous steps, as set forth herein, to implement and maintain the conspiracy, including monitoring compliance of fellow conspirators.

111. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements, combinations, and/or conspiracies described in this Complaint.

112. Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and applicable state laws discussed herein.

113.     The alleged contract, combination or conspiracy among competitors constitutes a *per se* violation of the federal antitrust laws.

114.     As a result of Defendants' unlawful conduct, Plaintiffs and the other Class members have been injured in their business and property because they have paid more for gypsum board manufactured by Defendants (or their subsidiaries or controlled affiliates) than they would have paid absent collusion.

115.     Defendants' unlawful conduct has had at least the following effects:

> a.  Restraining or eliminating price competition with respect to gypsum board;
>
> b.  Raising, fixing, stabilizing and maintaining prices for gypsum board at artificially inflated levels; and
>
> c.  Depriving indirect purchasers of gypsum board of the benefits of the interplay of free and unrestrained competitive forces.

116.     Gypsum board products are identifiable, discrete physical products that remain essentially unchanged when incorporated into a construction project. As a result, gypsum board follows a traceable physical chain of distribution from the Defendants to the Plaintiffs and the members of the Classes, and any costs attributable to gypsum board are likewise traceable through the chain of distribution to Plaintiffs and members of the Classes.

117.     Defendants' antitrust violations are continuing and will continue unless enjoined by this Court.

118.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Class are entitled to a final and permanent injunction against Defendants, preventing and restraining the violations alleged herein.

119.     Pursuant to the Clayton Act, Plaintiffs and the Class are entitled to the costs of prosecuting this suit, including reasonable attorneys' fees and expert fees.

120.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, each Plaintiff demands a jury trial as to all issues triable by a jury.

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS**
**(On Behalf of State Subclasses)**

121.     Plaintiffs incorporate by this reference the allegations in the above paragraphs as if fully set forth herein.

122.     By reason of the foregoing, the Defendants have entered into a trust, contract, combination, understanding, and agreement in restraint of trade in violation of Arizona Revised Stat. § 44-1401 *et seq.*[17]; California Bus. & Prof. Code § 16701 *et seq.*; District of Columbia Code Ann. § 28-4501 *et seq.*; 740 Illinois Comp. Stat. § 10/1 *et seq.*; Iowa Code § 553.1 *et seq.*; Kansas Stat. Ann. § 50-101 *et seq.*; Maine Rev. Stat. Ann. tit. 10, § 1101 *et seq.*; Michigan Comp. Laws. Ann. § 445.771 *et seq.*; Minnesota Stat. § 325D.49 *et seq.*; Mississippi Code Ann. § 75-21-1 *et seq.*; Nebraska Rev. Stat. §§ 59-801 *et seq.* and § 59-1601 *et seq.*; Nevada Rev. Stat. Ann. § 598A *et seq.*[18]; New Hampshire Revised Stat. Ann. § 356:1 *et seq.*; New Mexico Stat. Ann. § 57-1-1 *et seq.*; New York Gen. Bus. Law § 340 *et seq.*; North Carolina Gen. Stat. § 75-1 *et seq.*; North Dakota Cent. Code § 51-08.1-01 *et seq.*; Puerto Rico Laws Ann. tit. 10, § 257 *et seq.*; South Dakota Codified Laws § 37-1-3.1 *et seq.*; Tennessee Code Ann. § 47-25-101 *et seq.*;

---

[17] In compliance with Arizona's Antitrust Act, Ariz. Rev. Stat. § 44-1415, Plaintiff notified the Arizona Attorney General of the existence of this action.

[18] In compliance with the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. § 589A.210(3), Plaintiff provided the Nevada Attorney General with a copy of this Complaint.

Utah Code Ann. § 76-10-911 *et seq.*;[19] West Virginia Code § 47-18-1 *et seq.*; and Wisconsin Stat. § 133.01 *et seq.*

123.    State Subclass members in each of the states listed above paid supra-competitive, artificially inflated prices for gypsum board. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the State Subclasses have been injured in their business and property in that they paid more for gypsum board than they otherwise would have paid in the absence of the Defendants' unlawful conduct.

124.    As a result of the Defendants' violations of the statutes set forth above, Plaintiffs and other members of the State Subclasses seek damages and costs of suit, including reasonable attorneys' fees, and all other forms of relief available under the state antitrust statutes listed above.

## THIRD CLAIM FOR RELIEF
## VIOLATIONS OF STATE CONSUMER PROTECTION AND
## UNFAIR COMPETITION LAWS
### (On Behalf of State Subclasses)

125.    Plaintiffs incorporate by this reference the allegations in the above paragraphs as if fully set forth herein.

126.    The Defendants have engaged in unfair, unconscionable, deceptive, and fraudulent acts or practices and unfair methods of competition in violation of California Bus. & Prof. Code § 17200 *et seq.*; D.C. Code § 28-3901 *et seq.*; Florida Stat. § 501.201 *et seq.*; Massachusetts General Law, Chapter 93A; Nebraska Revised Statutes § 59-1601 *et seq.*; Nevada Rev. Stat. § 598.0903 *et seq.*; New Hampshire Rev. Stat. Ann. § 358-A *et seq.*; New Mexico Stat. Ann. § 57-12-1 *et seq.*; North Carolina Gen. Stat. § 75-1.1 *et seq*; Rhode Island Gen. Laws

---

[19] In compliance with Utah Code Ann. § 76-10-919(9), Plaintiff notified the Utah Attorney General of the existence of this action and provided a copy of the Complaint.

48

§ 6-13.1-1 *et seq.*; Utah Code Ann. § 13-11-1 *et seq.*; and Vermont Stat. Ann. tit. 9, § 2451 *et seq.*[20]

127. Members of the State Subclasses for the states listed above paid supra-competitive, artificially inflated prices for gypsum board. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and the members of the State Subclasses have been injured in their business and property in that they paid more for gypsum board than they otherwise would have paid absent the Defendants' unlawful conduct.

128. As a result of the Defendants' violations of the laws listed above, Plaintiffs and members of the State Subclasses for the states listed above are entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by the Defendants as a result of such business practices, including compensable and such other damages allowed by law.

## FOURTH CLAIM FOR RELIEF
## VIOLATIONS OF STATE UNJUST ENRICHMENT LAWS
### (On Behalf of the State Subclasses)

129. Plaintiffs incorporate by this reference the allegations in the above paragraphs as if fully set forth herein.

130. By reason of their unlawful conduct, Defendants should make restitution to Plaintiffs and members of the Indirect Purchaser State Subclasses listed below.

131. Plaintiffs and members of the following Indirect Purchaser State Subclasses, by overpaying for gypsum board, have conferred a benefit on Defendants. Defendants knowingly

---

[20] Pursuant to Massachusetts General Laws, Chapter 93A, § 1 *et seq.*, demand letters were sent to each of the Defendants on January 29, 2013. Defendants' response to those demand letters were either nonexistent or inadequate.

49

accepted and retained the overpayments such that it would be inequitable for Defendants to keep the inflated profits.

132.    The detriment suffered by Plaintiffs and the members of the State Subclasses, and the Defendants' unjust enrichment, were related to and flowed from the wrongful conduct alleged herein, including, without limitation, the Defendants' unlawful and anti-competitive acts described above which fixed, raised, and/or maintained the purchase price of gypsum board at supra-competitive levels.

133.    Under common law principles of unjust enrichment, the Defendants should not be permitted to retain the benefits conferred through over-payments by Plaintiffs and members of the State Subclasses.  Plaintiffs and the members of the State Subclasses accordingly are entitled to disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and members of the State Subclasses may seek restitution.

134.    Plaintiffs and the following Indirect Purchaser State Subclasses base their claims for unjust enrichment and disgorgement of profits upon common law principles of unjust enrichment recognized in each of their respective states:

    A.  Arizona Indirect Purchaser Class;

    B.  Arkansas Indirect Purchaser Class;

    C.  California Indirect Purchaser Class;

    D.  District of Columbia Indirect Purchaser Class;

    E.  Illinois Indirect Purchaser Class

    F.  Iowa Indirect Purchaser Class;

    G.  Kansas Indirect Purchaser Class;

H.  Maine Indirect Purchaser Class;

I.  Massachusetts Indirect Purchaser Class;

J.  Michigan Indirect Purchaser Class;

K.  Minnesota Indirect Purchaser Class;

L.  Mississippi Indirect Purchaser Class;

M. Missouri Indirect Purchaser Class;

N.  Nebraska Indirect Purchaser Class;

O.  Nevada Indirect Purchaser Class;

P.  New Hampshire Indirect Purchaser Class;

Q.  New Mexico Indirect Purchaser Class;

R.  New York Indirect Purchaser Class;

S.  Puerto Rico Indirect Purchaser Class;

T.  Rhode Island Indirect Purchaser Class;

U.  South Dakota Indirect Purchaser Class;

V.  Tennessee Indirect Purchaser Class;

W. Utah Indirect Purchaser Class;

X.  Vermont Indirect Purchaser Class;

Y.  West Virginia Indirect Purchaser Class; and

Z.  Wisconsin Indirect Purchaser Class.

## DEMAND FOR JURY TRIAL

135.  Pursuant to Federal Rule of Civil Procedure 38(b), each Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

## DEMAND FOR RELIEF

136.  Wherefore, Plaintiffs demand judgment against Defendants as follows:

(a)     Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class and State Subclasses as defined herein;

(b)     That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1 and applicable state laws described herein.

(c)     That judgment be entered for Plaintiffs and the Class on the first claim awarding injunctive relief.

(d)     That judgment be entered for Plaintiffs and the State Subclass members on the second claim for damages, trebled as allowed by law.

(e)     That judgment be entered for Plaintiffs and the members of the State Subclasses on the third claim for relief in the amount of damages sustained and/or restitution as allowed by law.

(f)     That judgment be entered for Plaintiffs and the members of the State Subclasses on the fourth claim for relief ordering restitution of amounts paid by them in excess of a competitive price as allowed by law.

(g)     That Plaintiffs and the members of the Class and State Subclasses recover pre-judgment and post-judgment interest as permitted by law.

(h)     That Plaintiffs and the members of the Class and State Subclasses recover their costs of the suit, including attorneys' fees and expert fees, as provided by law.

(i)     For such other and further relief as is just and proper under the circumstances.

DATED: March 4, 2013

Robert S. Green
James Robert Noblin
Lesley E. Weaver
**GREEN & NOBLIN, P.C.**
700 Larkspur Landing Circle, Suite 275
Larkspur, CA 94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
rsg@classcounsel.com
jrn@classcounsel.com
lew@classcounsel.com


Jeffrey C. Block
Whitney Street
Mark A. Delaney
**BLOCK & LEVITON LLP**
155 Federal Street, Suite 1303
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
Jeff@blockesq.com
Whitney@blockesq.com
Mark@blockesq.com


Douglas G. Thompson Jr.
L. Kendall Satterfield
Michael G. McLellan
Eugene J. Benick
**FINKELSTEIN THOMPSON LLP**
1077 30th St. NW, Suite 150
Washington, D.C. 2007
Telephone:  (202) 337-8000
Facsimile: (202) 337-8090
dthompson@finkelsteinthompson.com
ksatterfield@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com
ebenick@finkelsteinthompson.com


53

Kenneth I. Trujillo
Ira N. Richards
**TRUJILLO, RODRIGUEZ &**
**RICHARDS, LLC**
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
Telephone: (215) 731-9004
Facsimile: (215) 731-9044
ktrujillo@trrlaw.com
ira@trrlaw.com

*Attorneys for Plaintiffs and the Proposed*
*Indirect Purchaser Classes*